# Exhibit C

| 2120 - Served | 2121 - Served |
|---|---|
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| SUMMONS | ALIAS - SUMMONS |

(2/28/11) CCG N001

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW _____ DIVISION

No. 2016L002230
CALENDAR/ROOM Z
TIME 00:00
Product Liability

THE BOEING COMPANY c/o it's Registered Agent

ILLINOIS CORPORATION SERVICE C

801 ADLAI STEVENSON DRIVE, SPRINGFIELD, IL 62703

THOMAS WOOD, as Personal Representative of the Estate of PHILLIP TALMADGE WOOD, deceased

(Name all parties)

v.

THE BOEING CO., an Illinois Corporation

## ⊙ SUMMONS ◯ ALIAS SUMMONS

**To each Defendant:**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

⊙ Richard J. Daley Center, 50 W. Washington, Room **801** _____ , Chicago, Illinois 60602

| ◯ District 2 - Skokie | ◯ District 3 - Rolling Meadows | ◯ District 4 - Maywood |
|---|---|---|
| 5600 Old Orchard Rd. | 2121 Euclid | 1500 Maybrook Ave. |
| Skokie, IL 60077 | Rolling Meadows, IL 60008 | Maywood, IL 60153 |
| ◯ District 5 - Bridgeview | ◯ District 6 - Markham | ◯ Child Support |
| 10220 S. 76th Ave. | 16501 S. Kedzie Pkwy. | 28 North Clark St., Room 200 |
| Bridgeview, IL 60455 | Markham, IL 60428 | Chicago, Illinois 60602 |

You must file within 30 days after service of this Summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 46467

Name: Hays Firm LLC

Atty. for: Personal Representative

Address: 55 W. Wacker Dr, 14th Floor

City/State/Zip: Chicago, IL 60601

Telephone: (312) 626-2537

WITNESS, DOROTHY BR... MAR 0 2 2016

_____ , _____

_____
Clerk of Court

Date of service: _____ , _____
(To be inserted by officer on copy left with defendant or other person)

Service by Facsimile Transmission will be accepted at: _____

_____
(Area Code) (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| THOMAS WOOD, as Personal Representative ) | |
| of the Estate of PHILLIP TALMADGE WOOD, ) | |
| deceased, ) | |
| ) | CASE NO. |
| **Plaintiff**, ) | |
| ) | **JURY TRIAL DEMANDED** |
| v. ) | |
| ) | |
| THE BOEING CO., an Illinois corporation, ) | |
| ) | |
| **Defendant**. ) | |

## COMPLAINT

The Plaintiff listed in the caption of this Complaint (hereinafter "the Plaintiff"), on behalf

of the Decedent listed in the caption of this Complaint (hereinafter "the Decedent"), his estate, his

survivors, beneficiaries, and heirs, by and through undersigned counsel, for the purpose of making

and filing his complaint against the Defendant, THE BOEING COMPANY, an Illinois corporation

(hereinafter "Boeing"), hereby states as follows:

## GENERAL ALLEGATIONS

1.      This is an action for damages, pursuant to the Illinois Wrongful Death Act, 740 Ill.

Comp. Stat. 180/1 *et seq.*, and the Illinois Product Liability Act, 735 Ill. Comp. Stat. 5/13-213,

based on the malfunction of a defective product, namely, a Boeing 777-2H6ER airplane, with

serial number 28420 and registration number 9M-MRO ("the Boeing Airplane"), operated by

Malaysian Airline System Berhad ("MASB") as Flight MH370, which was traveling from Kuala

Lumpur, Malaysia, to Beijing, China, on March 8, 2014 ("Flight MH370"). The defects in the

Boeing Airplane resulted in the deaths of 239 people, among them the Decedent who was a

passenger onboard the Boeing Airplane.

## THE PARTIES

2.      At all times material to this Complaint, the Decedent, PHILLIP TALMADGE WOOD, was a citizen, national, and resident of the United States. Specifically, he was a resident of the State of Texas. PHILLIP TALMADGE WOOD was a passenger onboard Flight MH370.

3.      THOMAS WOOD is, and at all times material to this Complaint was, PHILLIP TALMADGE WOOD's brother and a resident of the State of Texas. On December 28, 2015, the probate court of Tarrant County, Texas, entered an order declaring PHILLIP TALMADGE WOOD's death, admitting PHILLIP TALMADGE WOOD's will to probate in the State of Texas, and appointing THOMAS WOOD as the Personal Representative of PHILLIP TALMADGE WOOD's Estate.

4.      Boeing is a corporation that has its principal place of business in, and is a resident of, Cook County, Illinois.

5.      Boeing is a corporation organized and incorporated under the laws of Illinois, with its principal place of business in Cook County, Illinois.

6.      At all times relevant to this Complaint, Boeing was engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, and distributing aircrafts and their component parts, including the Boeing Airplane that is the subject of this Action.

7.      Boeing designed, manufactured, produced, and assembled the Boeing Airplane, along with its component parts, in the State of Washington.

8.      Boeing completed the manufacture of the Boeing Airplane on May 29, 2002.

2

9. On May 31, 2002, Boeing sold and delivered the Boeing Airplane to MASB, knowing that the Boeing Airplane would be used by the aviation community for commercial flight operations.

## JURISDICTION AND VENUE

10. Jurisdiction is proper in the State of Illinois because Boeing "is a corporation organized under the laws of [Illinois]." 735 Ill. Comp. Stat. 5/2-209(b)(3).

11. Venue is proper in Cook County, pursuant to 735 Ill. Comp. Stat. 5/2-101, because Boeing resides in Cook County.

## THE FACTS

12. Boeing designed, manufactured, produced, and assembled the Boeing Airplane, along with its component parts, in the State of Washington.

13. Boeing completed the manufacture of the Boeing Airplane on May 29, 2002.

14. On May 31, 2002, Boeing sold and delivered the Boeing Airplane to MASB, knowing that the Boeing Airplane would be used by the aviation community for commercial flight operations.

15. At all times material to this Complaint, the Boeing Airplane was sold and/or delivered by Boeing without being altered by some other party, without substantial change in the condition in which it was sold and/or delivered by Boeing, and was being used as intended by, and/or in a manner that was reasonably foreseeable to, Boeing.

16. Specifically, MASB put the Boeing Airplane to its normal and intended use: commercial aviation.

## The Flight

### Phase One of Flight MH370

17.     On March 7, 2014, at 16:40 UTC,[1] Malaysia Airlines Flight MH370 departed from Kuala Lumpur International Airport ("KLIA"), in Kuala Lumpur, Malaysia, to Beijing, China.  In fewer than thirty minutes, Flight MH370 climbed to its assigned cruising altitude of 35,000 feet and began traveling at a true air speed of 542 miles per hour ("mph").  But the Boeing Airplane never arrived in Beijing.

18.     At 17:07 UTC, just seven (7) minutes after reaching its assigned cruising altitude, Flight MH370 issued its last acknowledged transmission using the Aircraft Communications Addressing and Reporting System ("ACARS") to a nearby ground station. ACARS is a digital data-link system that transmits short messages and reports using either digital (via SATCOM)[2] or analog (via Very High Frequency or "VHF")[3] radio waves.  ACARS automatically transmits "position reports" at pre-determined time intervals. These position reports include the Boeing Airplane's latitude, longitude, altitude, speed, air temperature, remaining fuel, wind direction, wind speed, and wind heading. ACARS is also capable of transmitting short voice and text communications. In addition, ACARS transmits information about weather, engine performance, connecting flights, and flight clearances. The Boeing Airplane was set to transmit information automatically every thirty minutes. Under MASB protocols, if the Boeing Airplane's ACARS

---

[1] Because Malaysian Time ("MYT") is eight (8) hours ahead of UTC time, Flight MH370 actually departed Kuala Lumpur International Airport on March 8, 2014 MYT.
[2] SATCOM is shorthand for "satellite communications." The Boeing Airplane's SATCOM terminal transmits data digitally from the aircraft using a network of satellites and Ground Earth Stations ("GES") managed by Inmarsat, plc., a global satellite service provider.
[3] The Boeing Airplane's Collins VHF-900B system transmits voice and data messages over short distances (up to 150 nautical miles).  The VHF system transmits voice communications using a two-way "push-to-talk" radio, which is activated whenever the speaker pushes and holds a button.  When a VHF call comes into the cockpit from the ground, the flight crew is alerted by virtue of an alert that sounds within the cockpit.

4

failed to transmit data after thirty minutes, MASB Operation Control Center ("OCC") would send a text message to the cockpit via ACARS or call the cockpit via SATCOM.

19.     At 17:11 UTC, Flight MH370 entered into Vietnam airspace and appeared on Ho Chi Minh Air Traffic Control's ("HCM") radar display.

20.     At 17:19 UTC, Flight MH370 was transferred to HCM and was instructed by Kuala Lumpur Air Traffic Control Center ("KL") to contact HCM.

21.     A few seconds later, Flight MH370 replied to KL's instruction with the now-famous words "Goodnight Malaysia Three Seven Zero." This was the last recorded radio transmission from Flight MH370.  At this point, Flight MH370 was still in radar range, where it could be tracked in real time.

22.     At 17:20 UTC, the Boeing Airplane passed through waypoint IGARI.

23.     One minute later, while still within radar range, the Boeing Airplane's unique Mode S Transponder identification code (known as a "squawk code") dropped from military and civilian radar displays—indicating that the Boeing Airplane's Mode S Transponder was no longer operational. The Boeing Airplane utilizes a Mode S Transponder to reply to Mode S interrogations from both secondary radars[4] and the Traffic Alert and Collision Avoidance Systems ("TCAS") of nearby aircraft.   During departure, air traffic controllers will assign to each aircraft a unique transponder identification code, known as a "squawk" code, which the flight crew inputs into the transponder so that air traffic controllers around the world can later identify that particular aircraft throughout its flight.   The Boeing Airplane's Mode S Transponder replies to secondary radar

---

[4] Primary radar sends a signal in the direction of an object and then waits for that signal to bounce off of that object and return to the radar station. Based on the length of time it takes the signal to bounce back, the primary radar allows controllers to calculate the distance of the object from the radar station. Secondary radar, on the other hand, sends out a signal to a compatible transponder onboard the aircraft, which then automatically responds to the signal with certain pieces of information about the aircraft, including its altitude, its heading, and its distance.

interrogations with a transmission that includes the aircraft's assigned squawk code, its altitude, its heading, and its distance.[5]

## Phase Two of Flight MH370

24.    At 17:30 UTC, an airplane that air traffic controllers identified as the Boeing Airplane appeared on primary radar displays in the region. The identified aircraft was seen heading in the opposite direction of Flight MH370's scheduled flight path.

25.    At 17:37 UTC, the Boeing Airplane failed to transmit its regular 30-minute ACARS report.

26.    At 17:52 UTC, the Boeing Airplane disappeared from civilian radar displays; thereafter, only military radar continued to track it. When it was last seen on civilian primary radar displays, the Boeing Airplane was approximately six (6) nautical miles south of Penang, heading southwest towards a small island over the Straits of Malacca.

27.    At 18:03 UTC, a ground station initiated an ACARS transmission with the Boeing Airplane, but the Boeing Airplane did not acknowledge the transmission—indicating that the ACARS system, like the Mode S Transponder, had malfunctioned and that the SATCOM link was no longer operational.

28.    At 18:05 UTC, a ground station initiated an ACARS transmission with the Boeing Airplane, but the Boeing Airplane did not acknowledge the transmission—indicating that the ACARS system was still malfunctioning and that the SATCOM link was still not operational.

---

[5] The Boeing Airplane was also equipped with Automatic Dependent Surveillance-Broadcast ("ADS-B"). ADS-B is a cooperative, satellite-based data link system that pulls navigation data from the aircraft and automatically broadcasts that data using the aircraft's Mode S Transponder. The ADS-B broadcast transmission will include the aircraft's squawk code, its Global Positioning System ("GPS") location, its altitude, its magnetic heading, its air and ground speed, its roll angle, its true track angle, and its vertical rate (collectively, the "tracking information" or "ADS-B data").

29.     At 18:07 UTC, the Boeing Airplane again failed to transmit its regular 30-minute ACARS report.

30.     At 18:22 UTC, the Boeing Airplane disappeared from military primary radar displays.  It would never appear on another radar display again.

### Phase Three of Flight MH370

31.     At 18:25 UTC, the Boeing Airplane initiated a log-on transmission (known as a "handshake")[6] with ground stations—indicating that the Boeing Airplane's SATCOM system had rebooted.[7]

32.     Between 18:25 UTC and 00:19 UTC—that is, over the course of approximately six hours after the Boeing Airplane disappeared from radar—the Boeing Airplane's SATCOM responded to five log-on interrogations (or "handshakes") initiated by ground stations. Each time, the Boeing Airplane transmitted a short message to the ground station, indicating that it was still logged onto the network.

33.     At 00:19 UTC, the Boeing Airplane initiated a final handshake with ground stations, indicating, again, that the SATCOM had rebooted.

34.     After this final handshake, Flight MH370 crashed and vanished, resulting in the deaths of 12 crew members and 227 passengers, including the Decedent named in this Complaint.

35.     During each of the log-ons at 18:25 UTC and 00:19 UTC, the ground stations recorded abnormal frequency offsets for the burst transmissions from the SATCOM.

36.     The Boeing Airplane's In-Flight Entertainment ("IFE") equipment set up two ground connections over SATCOM after the SATCOM re-established the link at 18:25 UTC,

---

[6] A handshake sends a very limited set of data, such as the transmission's time tag, the identity of the receiving satellite and ground station, the channel type, and the frequency.

[7] A handshake is only initiated by the airplane—as opposed to the ground station—when the airplane's system has rebooted.

7

which is normal, but it did not do so after SATCOM re-established its link at 00:19 UTC, which is an abnormal response to the re-establishment.

## The Search for the Boeing Airplane

37.     In the first week following Flight MH370's disappearance, some fourteen different countries, using forty-three ships and fifty-eight aircraft, participated in the search for the Boeing Airplane.

38.     Two years later, the Boeing Airplane and its passengers have still not been found.

39.     The disappearance of Flight MH370 is substantially the result of Boeing's decision not to equip the Boeing Airplane with readily available and reasonable alternative technologies that would have permitted the Boeing Airplane's precise location to be tracked in real-time anywhere on the planet.

40.     The disappearance of Flight MH370 is also the result of Boeing's decision to equip the Boeing Airplane, its Flight Data Recorder ("FDR"), and its Cockpit Voice Recorder ("CVR"),[8] with Emergency Locator Transmitters ("ELTs") and Underwater Locator Beacons ("ULBs") that, though intended to help investigators locate the Boeing Airplane, the FDR, and the CVR in the case of an accident, in fact, as Boeing was well aware, were ineffectual, especially in accidents taking place over water.

41.     Boeing elected to equip the Boeing Airplane with these ineffectual ELTs and ULBs despite the presence of other readily available and reasonable alternative technologies that would have allowed the Boeing Airplane, the FDR, and the CVR to be tracked in real-time anywhere on the planet, especially in cases of accidents.

---

[8] Together, the FDR and CVR are known as an airplane's "Black Boxes." They contain enormous amounts of data that would, if found, provide investigators with a great deal of precise information about precisely what went wrong with the Boeing Airplane. The Black Boxes, if found, would also provide the Plaintiff with meaningful closure about the fate of his loved ones.

42.     The uncertainty about the fate of his loved ones have resulted in a lack of finality and closure that has caused unprecedented levels of emotional and physical pain, distress, and mental suffering to the Plaintiff and the other survivors, heirs, and beneficiaries of the Decedent.

## The Cause of the Accident

43.     Every aviation accident can be traced to one or more of the following causes: pilot error; pilot suicide; terrorism and other foul play; maintenance error; weather; and/or product defect.

44.     As described more fully below, the almost two-year investigation into the disappearance of Flight MH370 has, to a reasonable degree of certainty, foreclosed the first five of these—pilot error, pilot suicide, terrorism or other foul play, maintenance error, and weather— as reasonable causes of that disappearance.

45.     As a result, even though the Boeing Airplane has not, as of the filing of this Complaint, been found, a reasonable inference that can be drawn from all of the available evidence is that the disappearance of Flight MH370 was the result of one or more defects in the manufacture and/or design of the Boeing Airplane.

## The Investigation of the Pilots[9]

46.     After the disappearance of Flight MH370, the Malaysian ICAO[10] Annex 13 Safety Investigation Team for MH370 ("the international investigation"), a 19-member independent team, working together with the Air Accident and Incident Investigations Organizations of seven different countries,[11] investigated the possibility that the pilots were responsible for the

---

[9] All of the evidence on the disappearance of the Boeing Airplane resides either at Boeing's headquarters or in the form of public reports that are available and accessible anywhere in the world.
[10] The International Civil Aviation Organization.
[11] The participating agencies are:
    (1)  The Australian Transport Safety Bureau (ATSB), Australia;
    (2)  The Air Accidents Investigation Branch (AAIB), United Kingdom;
    (3)  The Air Accident Investigation Bureau (AAIB), Singapore;

disappearance of Flight MH370. The investigation concluded that there was no evidence that either pilot was in any way to blame for the accident.

47.     Specifically, the working group found that the Pilot in Command ("PIC") was an extremely experienced captain with over 18,423 hours of flying time, including 8,659 hours on the Boeing 777-200. It concluded that, as a result of favorable ratings, he was repeatedly promoted throughout his career, from Second Officer on the F27, to First Officer on the Boeing 737-400, to Captain on the Boeing 737-400, to Captain on the A330-300, and finally to Captain on the Boeing 777-200. The Boeing Airplane was a Boeing 777-200.

48.     Indeed, by virtue of his good track record, the PIC was made a Type Rating Instructor and Type Rating Examiner for the Boeing 777-200 aircraft.

49.     All of the PIC's required licenses and certificates were current and valid as of the time of Flight MH370. Indeed, the PIC passed his last Instrument Rating Check on November 15, 2013; his last proficiency examination on November 15, 2013; and he achieved a First Class rating on his last Medical Certificate, which would have lasted him through June 30, 2014.

50.     The PIC's flying records show that, at the time of Flight MH370, he was well within MASB's specified time limits, both for the preceding 72 hours and over the course of the previous 28 days. This strongly suggests that he was neither tired nor overworked.

51.     In addition, the PIC had flown, without incident, just the day before—on March 7, 2014—on precisely the same route he would take with Flight MH370, from Kuala Lumpur to Beijing.

---

(4)  The Bureau d'Enquêtes et d'Analyses pour la Sécurité de l'Aviation civile (BEA), France;
(5)  The Civil Aviation Administration of China (CAAC);
(6)  The National Transportation Safety Board (NTSB), U.S.; and
(7)  The National Transportation Safety Committee (NTSC), Indonesia.

52.     There were no records of any disciplinary problems relating, or referring in any negative way, to the PIC—this despite his more than thirty years at MASB.

53.     The PIC's financial records indicated nothing out of the ordinary. He had not taken out a life insurance policy; he owed no significant debts; he had not experienced any recent financial difficulties; and his income easily paid for his and his family's expenses.

54.     The PIC suffered from no long-term physical ailment, and his First Class medical certifications were up to date.

55.     The PIC had no record of ever having suffered from any mental or emotional instability. Interviews with his family, including his wife, revealed nothing out of the ordinary and, to the contrary, suggested that he was a happily married family man.

56.     The Closed Circuit Television (CCTV) recordings from KLIA for the several weeks before Flight MH370 were reviewed to determine whether any change in the PIC's behavioral patterns could be detected. In all of the recordings, which included recordings of the PIC on the day of Flight MH370, the PIC's gait, posture, attire, facial expressions, and mannerisms appeared normal and unchanged.

57.     The voice recordings made by the PIC during Flight MH370 were also studied and shown to the PIC's family and friends. Nothing unusual or disturbing was found either in the tone and delivery of his speech or in the substance of those communications.

58.     The PIC did not exhibit, either on the day of Flight MH370 or in the weeks leading up to it, any signs of behavioral difficulties, such as social isolation, a change in habits or interests, self-neglect, or drug or alcohol abuse.

59.     Like the PIC, the First Officer (FO) was an experienced pilot with 2,813 hours of aeronautical experience, including more than 39 hours on the Boeing 777. As a result of favorable

ratings, he was repeatedly promoted throughout his young career, from Second Officer on the Boeing 737-400, to First Officer on the A330-300, and finally to First Officer on the Boeing 777-200. The Boeing Airplane was a Boeing 777-200.

60.     All of the FO's required licenses and certificates were current and valid as of the time of Flight MH370. Indeed, the FO passed his last proficiency examination on January 26, 2014, and he received a First Class Medical Certificate that would have taken him through October 31, 2014.

61.     The FO's flying records showed that he was well within MASB's specified time limits, both for the preceding 72 hours and over the course of the previous 28 days. This strongly suggests that he was neither tired nor overworked.

62.     There were no records of any disciplinary problems relating, or referring in any negative way, to the FO.

63.     The FO's financial records indicated nothing out of the ordinary. He owed no significant debts; he had not experienced any recent financial difficulties; and his income easily paid for his expenses.

64.     The FO suffered from no long-term physical ailment, and his First Class medical certifications were up to date.

65.     The FO had no record of ever having suffered from any mental or emotional instability.

66.     The Closed Circuit Television (CCTV) recordings from KLIA for the several weeks before Flight MH370 were reviewed to determine whether any change in the FO's behavioral patterns could be detected. In all of the recordings, which included the recordings from the date of

12

Flight MH370, the FO's gait, posture, attire, facial expressions, and mannerisms appeared normal and unchanged.

67.     The voice recordings made by the FO during Flight MH370 were also studied and shown to the FO's family and friends. Nothing unusual or disturbing was found either in the tone and delivery of his speech or in the substance of those communications.

68.     The FO did not exhibit, either on the day of Flight MH370 or in the weeks leading up to it, any signs of behavioral difficulties, such as social isolation, a change in habits or interests, self-neglect, or drug or alcohol abuse.

69.     Before disappearing from radar, the Boeing Airplane had cleared takeoff and was at its cruising altitude of 35,000—by far, the safest part of the flight. More than that, the pilots would have placed the Boeing Airplane into autopilot, which all but eliminates the possibility that pilot error could have led to the disappearance of Flight MH370.

70.     Moreover, Flight MH370 continued to fly for almost six hours after it lost radar contact. Had the disappearance resulted from pilot suicide, rather than from a product malfunction, the Boeing Airplane would have crashed immediately after losing radar contact. That it continued to fly for almost six hours thereafter without any communication is powerful evidence that the disappearance resulted, not from pilot suicide, but from a product defect that caused a malfunction onboard the Boeing Airplane.

71.     There is, significantly, no indication that the Boeing Airplane's SATCOM link was manually disabled from the cockpit. This disabling would have been recorded in the ground station's logs, but those logs reveal no such thing.

72.     Finally, neither the PIC nor the FO made any pleas of distress or left a suicide note in the days before Flight MH370.

73.     In short, there is simply no evidence that the disappearance and crash of Flight MH370 was in any way pilot-induced or pilot-caused. Indeed, to the contrary, all of the evidence strongly indicates that the pilots had nothing to do with the demise of Flight MH370.

### The Investigation of the Cabin Crew

74.     The international investigation of the ten members of the cabin crew likewise revealed nothing unusual. All were experienced and all were properly licensed and certified to fly.

75.     There were no records of any disciplinary problems relating or referring in any negative way to any of the ten members of the cabin crew.

76.     The cabin crew's financial records indicated nothing out of the ordinary. They owed no significant debts; they had not experienced any recent financial difficulties; and their incomes amply paid for their expenses.

77.     The cabin crew—aside from an epileptic episode involving the in-flight supervisor[12]—suffered from no long-term physical ailments, and their medical certifications were up to date.

78.     Not one of the ten members of the cabin crew had any record of ever having suffered from any mental or emotional instability.

79.     None of the ten members of the cabin crew made any pleas of distress or left a suicide note in the days leading up to Flight MH370.

80.     None of the ten members of the cabin crew exhibited, either on the day of Flight MH370 or in the weeks leading up to it, any signs of behavioral difficulties, such as social isolation, a change in habits or interests, self-neglect, or drug or alcohol abuse.

---

[12] The in-flight supervisor suffered an epileptic episode on June 9, 2013, for which he was admitted and received treatment. Subsequent to that episode, he was cleared to fly and had experienced no negative repercussions from his treatment.

14

81.    In short, there is simply no evidence that the disappearance of Flight MH370 was in any way induced by the cabin crew. Indeed, to the contrary, all of the evidence strongly indicates that the cabin crew had nothing to do with the demise of Flight MH370.

### Terrorism and Other Foul Play

82.    Over the almost two years since the disappearance of Flight MH370, a number of investigations conducted by a variety of different agencies around the world have probed the backgrounds of each of the 239 people onboard Flight MH370, including the 227 passengers. These investigations have included interviews with the passengers' family members and friends, reviews of the passengers' online profiles, examinations of the passengers' publicly available records, and analyses of the threats each passenger may have posed to the safety of others.

83.    In every case, the investigations have uncovered absolutely no evidence that anyone onboard Flight MH370 was in any way responsible for its disappearance.

84.    No passenger onboard Flight MH370 left a suicide or otherwise dangerous or threatening note in the days before the flight.

85.    At no point during Flight MH370 did any member of the cabin or flight crew issue any communication indicating that Flight MH370 had been hijacked or that it was in any way in the hands of terrorists or other criminals.

86.    Although terrorist groups are known to publicly proclaim their responsibility for the incidents of terrorism they cause, no terror or criminal group in the world has ever claimed responsibility for the disappearance of Flight MH370.

87.    Moreover, Flight MH370 continued to fly for almost six hours after it lost radar contact. Had the disappearance resulted from a terrorist or other criminal act, rather than from a product malfunction, the Boeing Airplane would have crashed immediately after losing radar

contact. That it continued to fly for almost six hours thereafter without any communication is powerful evidence that the disappearance resulted, not from terrorism or other foul play, but from a product defect that caused a malfunction onboard the plane.

88.     In short, there is simply no evidence that the disappearance and crash of Flight MH370 was in any way caused by terrorism or other foul play. Indeed, to the contrary, all of the evidence strongly indicates that terrorism and/or other foul play had nothing to do with the demise of Flight MH370.

### The Maintenance of the Boeing Airplane

89.     The Maintenance Schedule of the Boeing Airplane was conducted pursuant to the guidelines set forth by Boeing in the Boeing 777-200 Maintenance Review Board ("MRB") and Maintenance Planning Document ("MPD"), which describe in detail the various routine check types, the intervals and limitations on how the Boeing Airplane's maintenance and repair work is to be conducted, and the methods required to complete the prescribed tasks.

90.     A review of the Maintenance Schedule has revealed that the Boeing Airplane was inspected and maintained in strict accordance with the prescriptions set forth by Boeing's MRB and MPD.

91.     In addition to the Maintenance Schedule, MASB implemented a Supplementary Maintenance Schedule, through which it conducted non-mandatory maintenance tasks recommended, but not required, by Boeing. A review of the Supplementary Maintenance Schedule has revealed that the Boeing Airplane was inspected and maintained in strict accordance with the prescriptions set forth by MASB's Supplementary Maintenance Schedule.

92.     A review of maintenance and inspection records has revealed that, at the time of Flight MH370, the Boeing Airplane and its engines were fully compliant with all applicable Airworthiness Directives (AD).[13]

93.     The Licensed Aircraft Maintenance Engineers ("LAME") who worked on the maintenance and repair of the Boeing Airplane were all properly certified, trained, and licensed at the time they worked on the Boeing Airplane.

94.     A review of the Boeing Airplane's maintenance records further reveals that LAME properly serviced and replenished the crew oxygen system on March 7, 2014. A review of this servicing has revealed that the Boeing Airplane took off on Flight MH370 with sufficient oxygen for the entire duration of the flight.

95.     The Boeing Airplane's two engines, which were manufactured by Rolls Royce, were maintained by Rolls Royce through a contract with MASB. A review of the Engine Health Monitoring ("EHM") reports for the three months prior to Flight MH370 has revealed no evidence of improper maintenance by either MASB, the LAME, or Rolls Royce. Furthermore, the EHM reports have revealed no evidence of unusual engine behavior for either engine in the weeks or days leading up to Flight MH370.

96.     Typically, EHM reports are generated by the Aircraft Monitoring System ("ACMS") and transmitted during the flight to MASB through ACARS. A review of the in-flight EHM reports for the Boeing Airplane's previous ten flights has revealed no evidence of unusual engine behavior on any of those ten flights. However, aside from two EHM reports at the earliest stages of Flight MH370—one at takeoff (at 1641:58 UTC) and one at climb (at 1652:21 UTC)—

---

[13] An AD is a notification to owners and operators of certified aircraft that a known safety deficiency exists with respect to a particular model of aircraft, engine, or other aviation system and must be corrected. ADs are mandatory.

no further EHM reports were generated during the course of Flight MH370—indicating, again, that one or more systems on the Boeing Airplane were defective and malfunctioned.

97.     The Boeing Airplane's Central Maintenance Computing System ("CMCS") collects and stores information from most of the Boeing Airplane's systems. It both stores a history of faults within those systems and monitors and conducts tests on those systems. At regular intervals during flight, the Boeing Airplane's CMCS transmits recorded fault messages, through ACARS, to MASB's Maintenance Control Centre ("MCC"). A review of the Boeing Airplane's CMCS messages for the ten flights previous to Flight MH370 has revealed that the CMCS was properly transmitting messages to MASB for each of those flights. However, MASB received no maintenance messages from the CMCS during Flight MH370—indicating, again, that one or more systems on the Boeing Airplane were defective and malfunctioned.

98.     The Boeing Airplane was also within its authorized take-off weight when it took off for Flight MH370. According to the Boeing Airplane's Weight Schedule, dated June 12, 2009, the Boeing Airplane's maximum authorized take-off weight was 286,897 kg. When it took off on Flight MH370, the Boeing Airplane's calculated weight was well within that figure—at 223,469 kg.

99.     The Boeing Airplane's Transit Check and Fuel Log likewise reveal that the Boeing Airplane had more than sufficient fuel (24,900 kg in the Left Tank and 24,800 kg in the Right Tank) for its journey from Kuala Lumpur to Beijing.

100.     In short, there is simply no evidence that the disappearance of Flight MH370 was in any way related to a maintenance error. Indeed, to the contrary, all of the evidence strongly indicates that all mandatory and non-mandatory maintenance checks were properly and correctly

18

carried out by the various maintenance crews that worked on the Boeing Airplane before its disappearance and crash.

## The Weather

101.     There was no significant weather along the flight path of Flight MH370.

102.     Infrared satellite images taken by the geostationary Multifunctional Transport Satellites ("MTSAT") show that there was no rain along Flight MH370's flight path.

103.     The Malaysian Meteorological Department's Lightning Detection System ("LDS") detected no lightning discharges along Flight MH370's flight path.

104.     The Meteorological Aerodrome Reports ("METAR") issued at 1600, 1700, and 1800 UTC from Kota Bharu Airport, Kuala Terengganu Airport, Penang International Airport, and KLIA reported no significant weather along Flight MH370's flight path.

105.     There were no Pilot Reports ("PIREPs") of inclement or otherwise significant weather issued by or to any aircraft flying along or near Flight MH370's flight path.

106.     There were no PIREPs of inclement or otherwise significant weather issued by or to Flight MH370.

107.     In short, there is simply no evidence that the disappearance and crash of Flight MH370 was in any way related to a significant weather event. Indeed, to the contrary, all of the evidence strongly indicates that there was no significant weather along Flight MH370's flight path, and that weather had nothing to do with the disappearance and crash of Flight MH370.

## The Australian Transport Safety Bureau's Report

108.     On December 3, 2015, the Australian Transport Safety Bureau released its report on Flight MH370, entitled "MH370—Definition of Underwater Search Areas" (hereinafter "the Australian Report").

109. After analyzing all of the available evidence, including the transmissions received from Flight MH370, the Australian Report concluded that the most likely cause of the disappearance and crash of Flight MH370 was a massive and cascading sequence of electrical failures onboard the Boeing Airplane.

110. According to the Australian Report's findings, this sequence of electrical failures disabled vital systems, including the Boeing Airplane's ACARS and Mode S Transponder, making it impossible for the crew to navigate the Boeing Airplane or for the Boeing Airplane to communicate with ground stations.

111. This inability to control the Boeing Airplane or to communicate with ground stations explains why the Boeing Airplane traveled for so long, in the wrong direction, and without any capacity to send or receive signals.

112. The Australian Report found that, in light of the available evidence, Flight MH370 most likely flew, without pilot control, until the right engine ran out of fuel and flamed out.

113. Approximately fifteen minutes later, at 00:17:30 UTC, according to the Australian Report, the left engine flamed out. This second engine flameout resulted in the spool down of the generator, which caused the AC power to shut down. Without AC power, the Boeing Airplane's autopilot and auto-thrust systems disconnected, the Ram Air Turbine ("RAT")[14] deployed, and the Auxiliary Power Unit ("APU")[15] auto-start sequence commenced.

---

[14] The RAT forces the turbine blades to rotate.
[15] The APU is only activated when the Boeing Airplane's primary power sources shut down.

114.     Approximately one minute later, at 00:18:30 UTC, the APU powered up and began providing AC power to the Boeing Airplane. This, in turn, provided power to the Satellite Data Unit ("SDU"),[16] which began to reboot.

115.     This reboot explains why, one minute later, at 00:19:29, the SDU initiated the Boeing Airplane's final log-on request and handshake with ground stations. *See ¶ 88, supra.*

116.     The Australian Report concludes that the Boeing Airplane crashed within 90 seconds of the SDU-initiated log-on. This explains why the IFE connection transmission that was expected 90 seconds after the final handshake was never received. *See ¶ 91, supra.*

117.     The Australian Report also concluded that, taken together, the evidence is inconsistent with "a controlled ditching scenario." That is, "there is no evidence to suggest that the aircraft was under controlled flight" by the pilots when it disappeared and crashed. Instead, the evidence supports the notion that a massive malfunction onboard the Boeing Airplane prevented the pilots from exercising any control over the flight's operations.

### General Facts

118.     The Boeing Airplane has never been recovered.

119.     Without the Boeing Airplane, the Plaintiff cannot analyze the Boeing Airplane and, therefore, cannot point to any specific defect in its design or manufacture.

120.     However, the available evidence, both direct and circumstantial, forecloses other reasonable secondary causes—that is, reasonable secondary causes other than defects in the design and/or manufacture of the Boeing Airplane—for the disappearance and crash of Flight MH370.

---

[16] The SDU is an avionics device that allows the Boeing Airplane to connect with ground stations via SATCOM. In other words, all SATCOM communications onboard the Boeing Airplane would have been processed through the SDU.

121.    The Boeing Airplane failed to perform in the manner reasonably to be expected in light of its nature and intended purpose, inasmuch as, among other things, it failed to send automatic or manual communications through the ACARS system, failed to communicate with ground stations and satellites, flew completely off course, and crashed, killing everyone onboard.

122.    Under the laws of the States of Illinois, where this Action is filed, and Washington, where the Boeing Airplane was manufactured, this combination of facts—that Boeing designed and manufactured the Boeing Airplane; that Boeing placed the Boeing Airplane into the stream of commerce so that it could be used for commercial aviation operations; that the Boeing Airplane was being put to its normal and intended use at the time of the crash; that the Boeing Airplane did not perform as reasonably intended; and that the evidence forecloses other secondary causes—raises a genuine issue of material fact as to whether the Boeing Airplane crashed as a result of defects in its manufacture and/or design.

123.    That is, the Plaintiff has made out a *prima facie* case that the Boeing Airplane was defective, that the defect was an unreasonably dangerous condition, and that the defect existed when the Boeing Airplane left Boeing's control by showing that (1) the product was not being used in an abnormal manner during Flight MH370; (2) there are no reasonable secondary causes for the disappearance of Flight MH370; and (3) the Boeing Airplane failed to perform in a manner reasonably to be expected in light of its nature and intended function.

**COUNT I**
**STRICT PRODUCTS LIABILITY**
**AGAINST BOEING**

124.    The allegations set forth in paragraphs 1-123 of this Complaint are hereby re-alleged and incorporated as if fully set forth in this Count.

125.    At all times relevant to this Complaint, Boeing designed, assembled, manufactured, integrated, installed, modified, inspected, tested, repaired, marketed, sold, and distributed the

22

Boeing Airplane, together with its component parts, into the stream of commerce, with full knowledge and intent that the Boeing Airplane would be used by the aviation community, including passengers, for commercial flight operations.

126.    At all times material to this Complaint, the Boeing Airplane was sold and/or delivered by Boeing without being altered by some other party, without substantial change in the condition in which it was sold and/or delivered by Boeing, and was being used as intended by, and/or in a manner that was reasonably foreseeable to, Boeing.

127.    Specifically, MASB, the company to whom Boeing sold the Boeing Airplane, put the Boeing Airplane to its normal and intended use.

128.    The Boeing Airplane failed to perform in the manner reasonably to be expected in light of its nature and intended purpose, inasmuch as it failed, among other things, to send automatic or manual communications through the ACARS system, failed to communicate with ground stations and satellites, flew completely off course, and crashed, killing everyone onboard.

129.    When Boeing placed the Boeing Airplane into the stream of commerce, the Boeing Airplane was defective in its manufacture and/or design.

130.    The defects in the manufacture and/or design of the Boeing Airplane were unreasonably dangerous conditions.

131.    The Boeing Airplane was not reasonably safe as designed.   At the time of manufacture, the likelihood that the Boeing Airplane would cause injury or death to passengers onboard the Boeing Airplane, including the Decedent, and the seriousness of those harms, outweighed the burden on Boeing of designing the Boeing Airplane in a way that would have prevented those harms.

23

132.    The defects in the manufacture and/or design of the Boeing Airplane caused the crash and disappearance of Flight MH370, which led directly and proximately to the deaths of everyone onboard the Boeing Airplane, including the Decedent.

133.    The Decedent' death was a reasonable and foreseeable consequence of Boeing's defective design and/or manufacture of the Boeing Airplane.

134.    As a result of the death of the Decedent, the next of kin of the Decedent have suffered tremendous damages, thus subjecting Boeing to liability under (1) the Illinois Wrongful Death Act, 740 Ill Comp. Stat. 180/1 *et seq.*, for pecuniary losses, loss of companionship, loss of support, loss of guidance, loss of consortium, loss of advice, loss of society, and damages associated with grief, sorrow, and mental suffering; and (2) the Washington Wrongful Death Act, Wash. Rev. Code § 4.20.010 *et seq.*, for pecuniary losses, pain and suffering, anxiety, emotional distress, and humiliation.

WHEREFORE, the Plaintiff, as Personal Representative of the Estate of the Decedent, and on behalf of the Decedent's survivors, beneficiaries, and heirs, prays for the entry of a money judgment against Boeing in the form of such damages in excess of the jurisdictional limit as a jury deems reasonable and just, together with costs, attorneys' fees, and such other damages as may be allowed under the applicable law. The Plaintiff further demands a trial by jury of all issues triable as of right by a jury.

24

## COUNT II
## SURVIVAL ACTION
## AGAINST BOEING

135.    The allegations set forth in paragraphs 1-123 of this Complaint are hereby re-alleged and incorporated as if fully set forth in this Count.

136.    The allegations set forth in Count I of this Complaint are hereby re-alleged and incorporated as if fully set forth in this Count.

137.    As a direct and proximate result of the design and/or manufacturing defects in the Boeing Airplane, PHILLIP TALMADGE WOOD, suffered severe conscious pain and suffering of both mind and body prior to death.

138.    Pursuant to the Illinois Survival Act, 755 Ill. Comp. Stat. 5/1 *et seq.*, the Estate of PHILLIP TALMADGE WOOD is entitled to damages for the severe conscious pain and suffering of both mind and body of PHILLIP TALMADGE WOOD prior to death.

WHEREFORE, the Plaintiff, as Personal Representative of the Estate of the Decedent, and on behalf of the Decedent's survivors, beneficiaries, and heirs, prays for the entry of a money judgment against Boeing in the form of such damages in excess of the jurisdictional limit as a jury deems reasonable and just, together with costs, attorneys' fees, and such other damages as may be allowed under the applicable law. The Plaintiff further demands a trial by jury of all issues triable as of right by a jury.

## COUNT III
## NEGLIGENT PRODUCTS LIABILITY
## AGAINST BOEING

139.    The allegations set forth in paragraphs 1-123 of this Complaint are hereby re-alleged and incorporated as if fully set forth in this Count.

140.    At all times relevant to this Complaint, Boeing designed, assembled, manufactured, integrated, installed, modified, inspected, tested, repaired, marketed, sold, and distributed the Boeing Airplane, together with its component parts, into the stream of commerce, with full knowledge and intent that the Boeing Airplane would be used by the aviation community, including passengers, for commercial flight operations.

141.    At all times material to this Complaint, the Boeing Airplane was sold and/or delivered by Boeing without being altered by some other party, without substantial change in the condition in which it was sold and/or delivered by Boeing, and was being used as intended by, and/or in a manner that was reasonably foreseeable to, Boeing.

142.    Specifically, MASB, the company to whom Boeing sold the Boeing Airplane, put the Boeing Airplane to its normal and intended use.

143.    At all times material to this Complaint, Boeing owed a duty to use reasonable care, and to exercise the highest degree of care, in planning, designing, certifying, manufacturing, assembling, installing, overhauling, modifying, repairing, testing, inspecting, marketing, and distributing its aircraft, including the Boeing Airplane, and its component parts.

144.    This duty of care extended to those persons, including the Decedent, who would put the Boeing Airplane to its normal and intended use.

145.    At all times material to this Complaint, Boeing breached the aforementioned duties, and negligently and carelessly failed to discharge the aforementioned duties by designing and manufacturing the Boeing Airplane, which contained unreasonably dangerous defects when Boeing placed it into the stream of commerce and which failed to perform in a manner reasonably to be expected in light of its nature and intended function.

146.     Boeing knew or should have known that its failure to properly and safely design, manufacture, assemble, install, modify, test, and inspect the Boeing Airplane, including its component parts, would create an unreasonable risk of harm or death to persons, like the Decedent, onboard the Boeing Airplane.

147.     In addition, Boeing knew, or in the exercise of reasonable care should have known, that the failure or malfunction of any of its aircraft or their component parts, including the Boeing Airplane, would create an unreasonable risk of harm or death to persons onboard the aircraft.

148.     At the time of manufacture, the likelihood that the Boeing Airplane would cause injury or death to passengers onboard the Boeing Airplane, including the Decedent, and the seriousness of those harms, outweighed the burden on Boeing of designing the Boeing Airplane in a way that would have prevented those harms.

149.     The defects in the manufacture and/or design of the Boeing Airplane caused the crash and disappearance of Flight MH370, which led directly and proximately to the deaths of everyone onboard the Boeing Airplane, including the Decedent.

150.     As a result of the death of the Decedent, the next of kin of the Decedent have suffered tremendous damages, thus subjecting Boeing to liability under (1) the Illinois Wrongful Death Act, 740 Ill Comp. Stat. 180/1 *et seq.*, for pecuniary losses, loss of companionship, loss of support, loss of guidance, loss of consortium, loss of advice, loss of society, and damages associated with grief, sorrow, and mental suffering; and (2) the Washington Wrongful Death Act, Wash. Rev. Code § 4.20.010 *et seq.*, for pecuniary losses, pain and suffering, anxiety, emotional distress, and humiliation.

WHEREFORE, the Plaintiff, as Personal Representatives of the Estate of the Decedent, and on behalf of the Decedent's survivors, beneficiaries, and heirs, prays for the entry of a money

judgment against Boeing in the form of such damages in excess of the jurisdictional limit as a jury deems reasonable and just, together with costs, attorneys' fees, and such other damages as may be allowed under the applicable law. The Plaintiff further demands a trial by jury of all issues triable as of right by a jury.

**COUNT IV**
**SURVIVAL ACTION**
**AGAINST BOEING**

151.    The allegations set forth in paragraphs 1-123 of this Complaint are hereby re-alleged and incorporated as if fully set forth in this Count.

152.    The allegations set forth in Count III of this Complaint are hereby re-alleged and incorporated as if fully set forth in this Count.

153.    As a direct and proximate result of the design and/or manufacturing defects in the Boeing Airplane, PHILLIP TALMADGE WOOD suffered severe conscious pain and suffering of both mind and body prior to death.

154.    Pursuant to the Illinois Survival Act, 755 Ill. Comp. Stat. 5/1 *et seq.*, the Estate of PHILLIP TALMADGE WOOD is entitled to damages for the severe conscious pain and suffering of both mind and body of PHILLIP TALMADGE WOOD prior to death.

155.    On December 28, 2015, the probate court of Tarrant County, Texas, entered an order declaring PHILLIP TALMADGE WOOD's death, admitting PHILLIP TALMADGE WOOD's will to probate in the State of Texas, and appointing THOMAS WOOD as the Special Administrator of PHILLIP TALMADGE WOOD's Estate.

WHEREFORE, the Plaintiff, as Personal Representative of the Estate of the Decedent, and on behalf of his survivors, beneficiaries, and heirs, prays for the entry of a money judgment against Boeing in the form of such damages in excess of the jurisdictional limit as a jury deems reasonable

and just, together with costs, attorneys' fees, and such other damages as may be allowed under the applicable law. The Plaintiff further demands a trial by jury of all issues triable as of right by a jury.

Respectfully Submitted,

PLAINTIFF

By: _____
One of Plaintiff's Attorneys

Andrew T. Hays
HAYS FIRM LLC
55 W. Wacker Dr., 14th Floor
Chicago, IL 60601
(312) 626-2537
Atty. # 46467
ahays@haysfirm.com

and

Steven C. Marks, Esq.*
Roy K. Altman, Esq.*
PODHURST ORSECK, P.A.
25 West Flagler Street, Suite 800
Miami, FL 33130
(305) 358-2800
smarks@podhurst.com
raltman@podhurst.com
*Lead counsel, to be admitted pro hac vice*

ATTORNEYS FOR THE PLAINTIFF

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

THOMAS WOOD, as Personal Representative )
of the Estate of PHILLIP TALMADGE WOOD, )
deceased, )
             )     CASE NO.
           Plaintiff, )
             )     JURY TRIAL DEMANDED
v. )
             )
THE BOEING CO., an Illinois corporation, )
             )
          Defendant. )

## AFFIDAVIT OF DAMAGES, PURSUANT TO
## ILLINOIS SUPREME COURT RULE 222

     The Affiant, Sarah Buck, being first duly sworn on oath, deposes and states as

follows:

1.  I am the attorney for Plaintiff primarily responsible for handling this matter.

2.  The money damages sought in this matter exceed $50,000.00.

                FURTHER, AFFIANT SAYETH NOT.

                _____

                Sarah Buck, Affiant

Subscribed and sworn to
before me this 2nd day of March, 2016.

_____
Notary Public

JAIME L. NOLAN
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires
October 01, 2016